**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**August 10, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

JANNICE MCLAIN SCHMIDT,

Defendant-Appellant.

No. 06-1412
(D.C. No. 04-CR-103-REB)
(D. Colo.)

---

**ORDER AND JUDGMENT**[*]

---

Before **HENRY** and **ANDERSON**, Circuit Judges, and **BRORBY**, Senior Circuit Judge.

---

Jannice McLain Schmidt pleaded guilty to two counts of Securities Fraud and Aiding and Abetting in violation of 15 U.S.C. §§ 77q(a)(1) and 77x and 18 U.S.C. § 2.[1] The district court sentenced her to 60 months imprisonment on the first count and 48 months on the second count, to be served consecutively, for

---

[*] After examining the briefs and appellate record, this panel has determined unanimously to grant the parties' request for a decision on the briefs without oral argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

[1] She also admitted to one count of Criminal Forfeiture under 18 U.S.C. §§ 981, 1956, and 1961, and 28 U.S.C. § 2461.

a total sentence of 108 months.  She appeals from the district court's judgment and sentence.  We vacate her sentence and remand.

## FACTS

This case arises from a Ponzi scheme in which Schmidt participated.  The government estimates the aggregate intended loss to victims from the scheme at over $50 million.  Investors were told that they were investing in a high-yield investment program and that their investments would be insured against loss.  In reality, investor funds were used for other purposes, including payments to earlier investors and to those who ran the scheme.

Schmidt's plea agreement described her participation in the scheme:

> In the first part of 2001, [Schmidt] was solicited by defendant Charles Lewis to invest money in the Smitty's, LLC high-yield investment program. [Schmidt] initially understood that the program used investor funds to trade medium term notes (MTNs) with little or no risk because funds invested were maintained in a non-depleting bank account and insured against loss.  In the fall of 2001, [Schmidt] became the bookkeeper for Smitty's, which entailed performing the accounting necessary for the preparation of monthly statements, preparing checks for signature, and sending checks to investors seeking to withdraw money, all at the direction of defendant Norman Schmidt.  At or about the same time, [Schmidt] began to solicit investors in the Smitty's high-yield investment program and to receive commissions for persons whom she brought into the program. [Schmidt] later became aware that similar investment programs were being marketed through [other] entities.
>
> During the time that [Schmidt] was involved with these programs, Norman Schmidt was the principal and operator of Smitty's and the other entities named above, Charles Lewis solicited investors, and George Alan Weed purportedly arranged for the insurance on the investment. [Schmidt] learned at some point that

Michael Smith was involved with Charles Lewis and Capital Holdings. George Beros was known to [Schmidt] as a partner of Norman Schmidt in Monarch Capital Holdings and the trader of the medium term notes.

[Schmidt] continued to assist in the operation of Smitty's, including soliciting investors, maintaining investor accounts, and preparing and sending monthly statements to investors which falsely represented the status of the investment, up to and until the execution of various search and seizure warrants stemming from the investigation of this case on March 7, 2003. She also participated in soliciting investments through and sending monthly statements to investors in other entities[.] During this period, [Schmidt] became aware that investors' funds were not being deposited into non-depleting accounts, were not being used for the purposes represented to investors . . . and that no trading of MTNs had taken place.

R., doc. 750, at 4-5.

The two counts to which Schmidt pled guilty involved a comparatively small sum of money, $30,000.[2] The plea agreement listed several sentencing

---

[2] Count I involved her helping Charles Lewis to persuade a previous acquaintance of Schmidt's to invest $5,000 in the Smitty's high-yield investment program. Schmidt failed to disclose a material fact to the victim in connection with the solicitation: that Lewis had a prior Colorado felony conviction.

Count II involved an incident that occurred after the United States government seized the Smitty's, LLC bank accounts. An investor provided a cashier's check in the amount of $25,000 to Smitty's. Because of the seizure of Smitty's bank accounts, this check could no longer be negotiated. Schmidt and Norman Schmidt drove to the victim's home to persuade him to provide a cashier's check to replace the original check. Schmidt did not disclose to the victim Lewis's felony conviction, that the funds would not be used to trade MTNs, and that the Smitty's bank accounts had been seized by federal law enforcement agents. Schmidt and Norman Schmidt accompanied the victim to a bank, where a check was drawn payable to a different entity. Schmidt later assisted in opening a new account in the name of that entity, from which the

(continued...)

factors on which Schmidt and the government disagreed, including the amount of loss to be attributed to Schmidt for advisory sentencing guideline purposes. The government contended that the entire intended loss of more than $50 million should be attributed to Schmidt, raising her offense level by 24 levels. Schmidt noted her disagreement, but did not initially provide an alternate figure.

The probation department prepared a Presentence Investigation Report (PSIR). The PSIR stated that after additional analysis, the government now believed that the total intended loss attributable to Schmidt's participation in the scheme was between $20 million and $50 million. This adjustment was appropriate, the PSIR opined, because Schmidt had not been involved in the initial part of the scheme to defraud. PSIR, at 4. The PSIR further stated that "[d]efense counsel advised the probation officer that he believes . . . the loss to be significantly less, but has not yet provided the probation officer a written statement explaining his final loss calculation." *Id.*

Based on additional information supplied by the government, the probation department later calculated the intended loss attributable to Schmidt at $27,276,442.93. *Id.* at 16. This figure was based on the investor deposits into the "non-depleting accounts." *Id.* The PSIR further noted that defense counsel and

---

[2](...continued)
victim's funds were later withdrawn with Schmidt's assistance and used for purposes inconsistent with the representations made to the victim.

the government agreed that this amount should be reduced by the principal returned to investors.  The government did not believe, however, that the repaid principal would reduce the loss amount below $20 million.  For an intended loss between $20 million to $50 million, the Guidelines provided for an increase of 22 levels.  The PSIR adopted this loss range in its calculations.

The PSIR thus calculated Schmidt's advisory guideline sentence as follows:

| | |
|---|---|
| Base Offense Level: | 6 |
| Enhancement based on intended loss of $20,000,000 but less than $50,000,000 | +22 |
| Enhancement for 50 or more victims | + 4 |
| Enhancement for use of "sophisticated means" | + 2 |
| Adjusted Offense Level: | 34 |

*Id.* at 21-23.  The Adjusted Offense Level was then reduced by three levels because Schmidt accepted responsibility for her crimes, resulting in an aggregate level of 31.

Schmidt had no prior criminal history points. Accordingly, her criminal history category was I, which, when combined with the Adjusted Offense Level of 31, yielded an advisory guideline range of imprisonment of 108 to 135 months.  But because the statutory maximum penalty for the two offenses was only five years each, the PSIR reduced the high end of the range to 120 months, yielding an advisory guideline sentence of 108 to 120 months.  *See id.* at 31.

Schmidt filed objections to the PSIR, in which she stated "the Defendant does not yet know what amount of deduction to the gross loss number should be applied. . . . If the deduction takes the loss below[] $20,000,000, the calculation changes[.]" Defendant's Objections, at 2. She also requested a departure from the advisory guideline sentencing calculation, arguing that the government's figure "vastly exceeds the Defendant's participation in this investment scheme," which in her view should have been limited to investment funds deposited in the Smitty's investment accounts and not those monies raised by other entities "known as Capital Holdings, Monarch Capital Holdings, [and the] Northwestern Group." *Id.* at 5. Schmidt calculated the loss resulting from this more limited participation at $11,384,617. *Id.*

The probation department prepared an addendum to the PSIR. It noted that the government had supplied a revised loss figure, adjusted for return to investors, of $25,656,958.96. Addendum, at A-1. This revised figure would have no effect on the advisory guideline computation, since the amount of loss still exceeded $20 million. The probation department further rejected Schmidt's argument that her participation should be limited to the Smitty's accounts, noting that she was a registered agent of Monarch Capital Holdings, LLC, and that money was transferred into FastTrack, LLC, an entity she controlled.

During the sentencing hearing, Schmidt did not specifically renew her objection that the loss calculation should be limited to the Smitty's accounts.

Sentencing Tr. at 25-29.  The district court briefly addressed her previous objections to the loss calculation, however, stating that they were "overruled . . . generally for the reasons stated, arguments advanced, and authorities cited by the probation officer and the government." *Id.* at 41.  The court then accepted "the presentence report and its concomitant addenda, including the advisory sentencing guideline applications and calculations therein, as an integral part of [its] findings of fact." *Id.*  It further declined to depart downward from the advisory guideline range, again referring to "the reasons stated, arguments advanced, and authorities cited by the probation officer and the government." *Id.* at 42.  After considering the factors contained in 18 U.S.C. § 3553, the district court sentenced Schmidt as described above.

## ANALYSIS

Schmidt contends that the district court erred by relying solely on the PSIR to determine the amount of loss.  She further argues that there was an insufficient factual basis to hold her accountable for a loss in excess of $20 million.

### 1.  Standard of Review

The parties disagree concerning the standard of review, but it is now well established.  After *United States v. Booker*, 543 U.S. 220 (2005), we review sentences for reasonableness.  *United States v. Kristl*, 437 F.3d 1050, 1053 (10th Cir. 2006) (per curiam).  "[A] sentence that is properly calculated under the Guidelines is entitled to a rebuttable presumption of reasonableness." *Id.* at 1054;

*see also Rita v. United States*, 127 S. Ct. 2456, 2462-63 (2007) (concluding that a court of appeals may apply a presumption fo reasonableness to a within-Guidelines sentence). In considering the district court's application of the Guidelines, we review its factual findings for clear error and its legal determinations de novo. *Kristl*, 437 F.3d at 1054. We review compliance with the Rules of Criminal Procedure de novo. *United States v. Rodriguez-Delma*, 456 F.3d 1246, 1253 (10th Cir. 2006), *cert. denied*, 127 S. Ct. 1338 (2007).

## 2. Reliance on PSIR

Federal Rule of Criminal Procedure 32(i)(3)(B) requires a sentencing court to make a ruling on any disputed portion of the presentence report, unless it determines that a ruling is unnecessary because the controverted matter will not affect sentencing. *See also* U.S. Sentencing Guidelines Manual § 6A1.3(b) (2002) (requiring resolution of disputed sentencing factors at sentencing). Schmidt contends that the district court did not satisfy the Rule because it failed to make a "clear and independent ruling" on the disputed amount of loss and instead "merely adopt[ed] the factual findings and guideline applications of the PSIR." *United States v. Williams*, 374 F.3d 941, 947 (10th Cir. 2004).

The district court "may accept any undisputed portion of the presentence report as a finding of fact." Fed. R. Crim. P. 32(i)(3)(A). When a defendant alleges a factual inaccuracy in the PSIR, however, the district court must resolve

the factual dispute and may not simply refer back to the PSIR itself to defeat the objection. *Rodriguez-Delma*, 456 F.3d at 1253.

In her objections to the PSIR, Schmidt disputed her involvement with the entities known as Capital Holdings, Monarch Capital Holdings, and the Northwestern Group. The district court did not make a finding concerning whether Schmidt was involved with these entities. Instead, it simply adopted the PSIR's findings and the government's arguments on this point. Under *Williams* and other pertinent authority, this was not a sufficient finding. A remand for an appropriate finding is therefore required.

The government raises several arguments in opposition to remand. First, it argues that Schmidt waived or conceded her challenge to her participation in the entities other than Smitty's by failing to raise the objection in her initial submission prior to issuance of the PSIR and by failing to renew the argument at the sentencing hearing. We do not find her argument waived, however. The PSIR specifically acknowledged and addressed the argument in question, which was raised in Schmidt's objections. *See* Fed. R. Crim. P. 32(f)(1) (establishing procedure for objections). The PSIR's factual finding remained in contention at sentencing, where the district court ruled upon it without the necessary factual finding.

Second, the government argues that Schmidt did not raise an authentic factual dispute, but merely disputed the district court's application of the

Guidelines. Challenges to the district court's application of the Guidelines alone do not implicate Rule 32's requirement of a specific finding as to the accuracy of disputed facts. *Rodriguez-Delma*, 456 F.3d at 1253; *United States v. Windle*, 74 F.3d 997, 1002 (10th Cir. 1996). But while Schmidt's challenge addressed the application of the Guidelines, requesting a downward departure, it also raised a disputed factual issue for resolution: whether Schmidt participated in the fraud perpetrated through entities other than Smitty's. The district court was therefore required to make a finding to resolve this factual dispute.

Third, the government argues that Schmidt was required to offer evidence beyond her own personal denials to trigger the district court's further inquiry into the loss issue. It was the government's burden to prove the enhancement in Schmidt's base offense level resulting from her participation in the scheme. *Williams*, 374 F.3d at 947 (stating government bears burden of establishing sentence enhancements under Guidelines).[3] Using the government's own data, Schmidt arrived at a specific but substantially smaller loss figure than that contained in the PSIR. This provided a sufficient evidentiary basis to establish a disputed issue of fact, requiring a specific finding by the district court.

---

[3]    We acknowledge that Schmidt presented her factual dispute in the context of a request for a downward departure rather than as a direct attack on her offense level. Nevertheless, the factual dispute goes to the nature of relevant conduct to be attributed to her, a factor relevant also to determining the enhancement requested by the government.

The evidence showed that Schmidt was originally recruited as a victim into the scheme, and only later became a participant. The plea agreement lacks detail concerning her participation in specific aspects of the scheme. Given her objection to the PSIR, the nature and extent of her participation were key factors to be resolved in determining the appropriate advisory Guideline range and her appropriate sentence. *See* U.S. Sentencing Guidelines Manual §§ 1B1.3(a)(1)(A) and (B) (2002) (addressing relevant conduct), 2B1.1 cmt. 2 (addressing loss calculation).

### 3. Sufficiency of Evidence

Schmidt also argues that the evidence was insufficient to justify the enhancement. She contends that the district court could only rely on conduct to which she pleaded guilty or which was proved to a jury beyond a reasonable doubt. This is not the law, however. "[S]o long as the district court applies the Guidelines in an advisory, rather than a mandatory, fashion, it may rely on facts found by a judge to be true based on a preponderance of the evidence." *United States v. Bustamante*, 454 F.3d 1200, 1202 (10th Cir. 2006). The district court treated the Guidelines as advisory and could therefore find facts by a preponderance in sentencing Schmidt. While its finding here was insufficient in light of the factual dispute, Schmidt's admission to the relevant conduct was not required.

Schmidt also complains that the district court impermissibly relied on hearsay evidence, in the form of bank deposit information submitted by the government. For hearsay to serve as a basis for a sentencing enhancement, the Sentencing Guidelines require that the statement possess "sufficient indicia of reliability to support its probable accuracy." U.S Sentencing Guidelines Manual § 6A1.3(a) (2002); *see also United States v. Dazey*, 403 F.3d 1147, 1177 n.7 (10th Cir. 2005) (citation omitted). This is not a high standard, for it requires only "minimal indicia of reliability." *United States v. Fennell*, 65 F.3d 812, 813 (10th Cir. 1995) (citing *United States v. Beaulieu*, 893 F.2d 1177, 1181 (10th Cir. 1990)). The evidence before the district court concerning the amount of loss appears to possess sufficient indicia of reliability to support its probable accuracy concerning the actual losses incurred by the victims. We decline to address at this time, however, whether this evidence would have been sufficiently reliable to support a proper finding on the disputed participation issue, had one been made. On remand for the additional findings we have ordered, the district court should determine whether further proceedings or the reception of additional evidence on this question are required.

We VACATE the district court's sentence, and REMAND for further proceedings in accordance with this order and judgment.

Entered for the Court

Stephen H. Anderson
Circuit Judge